# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MATTHEW M. BRUCKEL, MD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2021-0579-MTZ |
| | ) | |
| TAUC HOLDINGS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 11, 2023
Date Decided: July 17, 2023

Ethan H. Townsend, Kevin M. Regan, MCDERMOTT WILL & EMORY LLP, Wilmington, Delaware; Jennifer Aronoff, MCDERMOTT WILL & EMORY LLP, Chicago, Illinois; Megan E. Thibert-Ind, MANATT, PHELPS & PHILLIPS, LLP, Chicago, Illinois, *Attorneys for Plaintiff.*

Ronald N. Brown, III, Kelly L. Freund, DLA PIPER LLP (US), Wilmington, Delaware; James C. Bookhout, Mallory Biblo, DLA PIPER LLP (US), Dallas, Texas, *Attorneys for Defendant.*

**ZURN, Vice Chancellor**

A manager of a limited liability company sued to obtain the books and records to which he is entitled.  The company resisted through and after trial, including by withholding books and records to which the manager had unfettered rights; failing to identify whether formal board materials exist; altering the way the board functions in an attempt to duck the company's production obligations; manufacturing weeks-long delays in conveying books and records; and overdesignating documents and communications as privileged.

The company is in contempt of orders issued in this case.  Because the board appears incapable of satisfying the plaintiff's entitlement to company documents, a receiver has been appointed to carry out that task.  The company's privilege overdesignations result in a limited privilege waiver.  This opinion concludes the company's conduct justifies the application of a narrow exception to the rule that each side in litigation bears its own fees:  the manager's fees incurred in this action are shifted to the company.

I.       **BACKGROUND**

Plaintiff Matthew M. Bruckel, MD is a "Founder Member" and manager of Defendant TAUC Holdings, LLC ("Defendant," the "Company," or "TAUC"), which is managed by a board of managers (the "Board").[1]  He holds information

---

[1] Docket Item ("D.I.") 38 at  III ¶¶ 1, 9; Joint Exhibit ("JX") 1 [hereinafter "LLC Agr."] §§ 1.1, 5.1(a)–(b)(i).

1

rights under Defendant's operating agreement.[2] As a "Founder Member," Plaintiff may designate a representative eligible "upon reasonable notice and during normal business hours, to inspect the books and records of [Defendant] or any of its Operating Companies and make copies thereof or extracts therefrom."[3] On June 18, 2021, Plaintiff served a demand on Defendant under 6 *Del. C.* § 18-305 and Section 11.1(c) of Defendant's operating agreement seeking six categories of documents.[4] On July 6, Plaintiff filed a Verified Complaint for Inspection of Books and Records seeking the same six categories of documents.[5]

### A. The Court Orders Documents To Be Produced And Suggests Fee-Shifting May Be Appropriate.

On December 14, 2021, I held a one-day trial.[6] The trial revealed extreme disdain between Plaintiff and the other managers has impeded necessary information between the two managerial factions.[7] At trial, Defendant asserted Plaintiff "lack[ed] a proper purpose," "Plaintiff's stated purposes [were] not his primary

---

[2] LLC Agr. § 11.1(c).

[3] *Id.* §§ 1.1, 11.1(c).

[4] JX 4.

[5] D.I. 3; *id.* ¶ 18.

[6] D.I. 44; D.I. 59 [hereinafter "Trial Tr."].

[7] D.I. 90 [hereinafter "Contempt Hr'g Tr."] at 45 ("I think, as I reflected, it seemed to me that most of the time spent at trial was on these interpersonal issues. It, frankly, wasn't a very helpful trial to me in that regard."); *see also, e.g.*, *id.* at 45–46; Trial Tr. 59, 65, 99, 135, 155, 195, 197, 234, 240–45.

purposes," and Plaintiff's demand was "deficient" under 6 *Del. C.* § 18-305(e).[8]

Defendant also asserted it could not produce documents that "do not exist," such as records of "board conversations."[9]

At the end of trial, I made partial rulings in Plaintiff's favor ("Post-Trial Rulings") and concluded: "Dr. Bruckel is a manager of a Delaware LLC with unfettered access . . . to everything in Section 18-305(a) that is reasonably related to his status as a manager;" the best proxy for what is reasonably related to his status as a manager "is what the other managers are being given and documents that reflect how the other managers meet and act collectively to do their jobs in that capacity;" and "he also has a contractual right that doesn't have that proper-purpose restriction."[10]

Because trial focused more on interpersonal grievances than the documents Plaintiff sought, the parties had work to do. Defendant made a limited production on January 25, 2022.[11] I instructed the parties to review Defendant's production with an eye toward categorizing the documents by demand category and evaluating

---

[8] D.I. 34 at 12–13, 23, 25–28 (capitalization altered); *id.* at 13 ("Thus, Dr. Bruckel's demand was deficient, and he did not send the power of attorney until twenty days after he filed the instant suit.").

[9] *Id.* at 28 (internal quotation marks omitted).

[10] Trial Tr. 318–19.

[11] *See* D.I. 64 at 10 (citing Exhibit P to Defendant TAUC Holdings, LLC's Written Submission Regarding Attorneys' Fees).

what was missing and what did not exist, and to create a joint document I called a "Crib Sheet" memorializing their conclusions. In particular, Defendant was to certify if any missing demanded documents did not exist.[12]

The parties requested assistance, and I held a post-trial status conference on March 11.[13] It became clear that Defendant had not been forthcoming about what documents did not exist; I indicated Plaintiff could take a Rule 30(b)(6) deposition on "how do the managers do their managing, and what documents reflect the managing that the managers do."[14] On June 23, Plaintiff deposed a TAUC representative.[15]

That deposition revealed that, after my Post-Trial Rulings indicating Plaintiff had an unfettered right to managerial materials, Defendant's other managers took evasive action. They stopped meeting as a full group, and instead began holding "weekly group update[s]" in which the CEO and other managers would meet as a subgroup to manage TAUC, but rotate out one participant to avoid the appearance

---

[12] *Bruckel v. TAUC Hldgs., LLC*, 2023 WL 116483, at *2 (Del. Ch. Jan. 6, 2023) (citing Trial Tr. 321).

[13] D.I. 47; D.I. 48; D.I. 49; D.I. 50; D.I. 51.

[14] D.I. 51 at 14–15; *see also Bruckel*, 2023 WL 116483, at *2 (quoting D.I. 51 at 6–7, 13–15).

[15] D.I. 52; D.I. 63, Ex. A [hereinafter "TAUC Tr."].

they were holding Board meetings without Plaintiff.[16] The partial Board met over sixty times in this manner between the December 14, 2021 trial and defendant's June 2022 Rule 30(b)(6) deposition.[17]

On July 29, Plaintiff filed letters attaching the parties' attempt at the Crib Sheet and requesting a second post-trial teleconference, which was held on November 1.[18]

On December 1, 2022, the parties filed a letter confirming Defendant declined to produce the remaining documents and communications Plaintiff sought (the "Outstanding Requests") and seeking a ruling on those requests.[19] Defendant also insisted it had no obligation to produce any documents dated after trial, pressing that "*there is no basis, almost a year after trial, for Plaintiff to request to expand the*

---

[16] D.I. 53, Ex. A [hereinafter "Crib Sheet"] at 10 ("To circumvent the Court's [trial] ruling while continuing to conduct informal meetings, TAUC now ensures that [non-Bruckel] managers 'rotate in' so not all managers are present at a given meeting, as is now the practice with respect to TAUC's 'weekly group update' attended by Dr. Dinkel, the CEO, [Board Chair Ira] Moreland and other rotating managers, excluding Dr. Bruckel." (citing TAUC Tr. 39)); *see also id.* (citing TAUC Tr. 18–19); D.I. 58 at 2.

[17] Crib Sheet at 8–10, 14 (citing TAUC Tr. 18–20, 39).

[18] D.I. 53; Crib Sheet; D.I. 54; D.I. 55; D.I. 56; D.I. 57.

[19] D.I. 58.

*time period at issue by nearly twelve months*."[20]  Defendant "request[ed] a final order stating that production is complete."[21]

On January 6, 2023, I responded to the parties' December 1 letter with a letter opinion and order (the "Post-Trial Opinion").[22]  I concluded:

> Plaintiff is entitled to non-privileged communications responsive to the Outstanding Requests to or by a manager communicating in his capacity as a manager relating to TAUC business, TAUC management meetings (formal or informal), or the bolt-on acquisition. . . .  [And] Defendant must provide all formal Board materials to all of its managers, and to the extent Defendant continues to conduct business informally, it must provide all informal Board materials to all of its managers.  Defendant also has an obligation to permit Plaintiff to inspect all TAUC books and records.[23]

The Outstanding Requests required Defendant to produce documents "on or since February 12, 2021" through present.[24]

The Post-Trial Opinion also addressed Defendant's position that its production obligations ended with its January 25, 2022 production.[25]  I emphasized

---

[20] D.I. 58 at 5 (emphasis in original); D.I. 58, Ex. A at 3 (emailing Plaintiff's counsel on November 7, 2022, "Finally, there is no basis, almost a year after the trial in this matter, for your request to expand the time period at issue"); *see* D.I. 58 at 3 (explaining Defendant only produced pre-trial documents).

[21] *Bruckel*, 2023 WL 116483, at *4 (internal quotation marks omitted) (quoting D.I. 58 at 6).

[22] *See generally id.*  The Post-Trial Opinion is also available at D.I. 60.

[23] *Id.* at *4–5.

[24] *Id.* at *3.

[25] *Id.* at *4; *id.* (citing D.I. 58 at 6); *id.* at *5 (citing D.I. 58 at 5).

Defendant's "ongoing [statutory] obligation to provide [Plaintiff] equal access to books and records related to [his] status as manager," and its "omnipresent contractual . . . obligation to permit Plaintiff to inspect all TAUC books and records."[26]  I reiterated that "[t]he best proxy for what is reasonably related to his status as a manager 'is what the other managers are being given and documents that reflect how the other managers meet and act collectively do their jobs.'"[27]

In the Post-Trial Opinion, I invited Plaintiff to bring a contempt motion should Defendant violate its obligations.[28]  The Post-Trial Opinion also served as a rule to show cause as to why fees should not be shifted to Defendant in this matter.[29]  On January 26, Defendant filed its response opposing fee shifting, and Plaintiff filed his reply on February 9 in support of shifting fees.[30]

### B. Defendant Fails To Provide And Produce Documents To Plaintiff, And The Court Appoints A Receiver As A Sanction For Defendant's Contempt.

The day the Court issued the Post-Trial Opinion, Plaintiff's counsel reached out to Defendant's counsel to facilitate production encompassing the full date range

---

[26] *Id.* at *4.

[27] *Id.* at *2 (quoting Trial Tr. 319).

[28] *Id.* at *5.

[29] *Id.*

[30] D.I. 64; D.I. 74.

7

ordered by the Court.[31]  Defendant's counsel did not respond, and Plaintiff's counsel followed up on January 10.[32]  Defendant's counsel replied, refusing to collect materials reflecting the full date range.[33]  Defendant asserted its January 2022 production included any responsive documents from February 12, 2021 through December 22, 2021 or January 1, 2022.[34]  Plaintiff's counsel repeatedly requested a hit report from February 12, 2021 through January and into February 2023.[35]

On February 26, in preparation for a Board meeting originally scheduled for February 28, all the managers but Plaintiff received an email providing Board materials and soliciting the other managers' comments about a potential joint

---

[31] D.I. 76, Transmittal Affidavit of Kevin M. Regan, Esquire in Support of Plaintiff's Motion for Civil Contempt and Sanctions, Ex. 1 at 9.  Attorney Regan's transmittal affidavits do not repeat exhibit numbers.  D.I. 76 (attaching exhibits 1 through 5); D.I. 82 (attaching exhibits 6 through 14).  For simplicity, I will refer to both affidavits collectively as "Regan Aff."

[32] Regan Aff., Ex. 1 at 9.

[33] *Id.* at 8.

[34] *Id.* at 2; D.I. 78 at Certification of Ronald N. Brown, III, Esq. in Support of Defendant TAUC Holdings, LLC's Written Submission Opposing Plaintiff's Motion for Civil Contempt and Sanctions [hereinafter "Mar. Brown Cert."] ¶¶ 3–5 (certifying after the Post-Trial Opinion, Defendant only collected documents from "Dr. Dinkel from December 22, 2021 through January 6, 2023 and the accounts for the other Managers from January 1, 2022 through January 6, 2023. . . . because TAUC previously collected, reviewed, and produced the documents through December 22, 2021 and January 1, 2022, respectively, ordered by the Court in its bench ruling following trial on December 14, 2021.").  I read attorney Brown's certification to say that Defendant did not search for the Outstanding Requests to the extent they pre-dated December 22, 2023 and January 1, 2022.

[35] Regan Aff., Ex. 1 at 2, 5.

venture.[36]  The meeting was ultimately scheduled for March 10; Plaintiff received

the Board packet on March 9.[37]  Plaintiff sought more information from the Board

chair, including whether the proposed transaction would be subject to Board

approval, how long the transaction had been planned, and whether the other

managers had been informed of the transaction before March 9.[38]  The chair waited

until less than half an hour before the March 10 meeting to reply to Plaintiff's email,

yet declined to respond to his questions.[39]  At the Board meeting, Plaintiff objected

that he was insufficiently informed to vote.[40]  The other managers did not answer his

questions about the transaction.[41]  The other managers voted to approve the

transaction.[42]

That day, Plaintiff filed his Motion for Civil Contempt and Sanctions (the

"Contempt Motion") alleging Defendant failed to produce any of the additional

---

[36] D.I. 76 at 7–9; Regan Aff., Ex. 2; Contempt Hr'g Tr. 11; *see also id.* 46–47 ("THE
COURT:  And the other details about that transaction that were circulated before the March
10th meeting?  ATTORNEY BOOKHOUT:  The – there are a handful, five to ten
documents, relating to that transaction that other managers received very far in advance,
none of which are as detailed as what was in this board presentation.").

[37] D.I. 82 at 6.

[38] Regan Aff., Ex. 3 at 2–3.

[39] *Id.* at 1.

[40] D.I. 76 at 8.

[41] *Id.*

[42] *Id.*

Court-ordered documents and failed to produce a compliant protocol for facilitating Plaintiff's access to information going forward.[43]

On March 13, Defendant made its first production of documents following the January 6 Post-Trial Opinion, and provided a privilege log.[44] This production did not reflect the February 12, 2021-to-present date range ordered in the Post-Trial Opinion, but rather began December 22, 2021 or January 1, 2022, depending on the custodian, and ended January 6, 2023.[45]

On March 14, Defendant sent a proposed protocol for how it would provide manager-level Board materials to Plaintiff going forward (a "Go-Forward Protocol").[46] Defendant proposed granting Plaintiff the equal access ordered by this Court by routing managerial books and records to counsel for review, who would then produce them to Plaintiff fourteen business days after the other managers received them.[47] On March 20, Defendant filed a certification in support of its opposition to the Contempt Motion asserting its production was complete as of January 6.[48]

---

[43] D.I. 76.

[44] D.I. 78 at 2, 6, 13; Regan Aff., Ex. 6 at 7.

[45] D.I. 76 at 6–7, 12–13; *Bruckel*, 2023 WL 116483, at *3; Mar. Brown Cert. ¶¶ 3–5.

[46] D.I. 78 at 2, 6; Regan Aff., Ex. 6 at 6.

[47] Regan Aff., Ex. 6 at 2, 6; Contempt Hr'g Tr. 16, 30–31.

[48] Mar. Brown Cert. ¶ 15.

On March 22, Plaintiff sent Defendant a letter asserting Defendant's privilege log was deficient.[49]  Defendant did not respond.[50]  On April 3, Defendant's counsel filed a certification asserting its production was compliant and complete.[51]

The parties briefed the Contempt Motion, and I held argument on April 11 (the "Contempt Hearing").[52]  At the conclusion of the Contempt Hearing, I instructed Defendant to provide an amended Go-Forward Protocol consistent with the Post-Trial Opinion's directive to provide equal access, and to produce the books and records in compliance with the time period ordered in the Post-Trial Opinion.[53]  I also asked that Defendant respond to Plaintiff's concerns about its privilege log.[54]  Finally, I asked the parties to confer and submit names of three Delaware attorneys who could serve as possible receivers to facilitate the production of documents to Plaintiff.[55]  They did that on April 17.[56]

On April 20 and 21, the parties submitted dueling letters reflecting they were at an impasse over a Go-Forward Protocol, the burden of producing existing

---

[49] Regan Aff., Ex. 9; Contempt Hr'g Tr. 18.

[50] Contempt Hr'g Tr. 37.

[51] D.I. 81, Ex. A, Certification of Ronald N. Brown, III, Esq. in Compliance with the Court's Order of January 6, 2023 [hereinafter "Apr. Brown Cert."].

[52] D.I. 78; D.I. 82; D.I. 85; Contempt Hr'g Tr.

[53] Contempt Hr'g Tr. 56.

[54] *Id.*

[55] *Id.* 55.

[56] D.I. 86.

11

documents, and Defendant's privilege log.[57] I concluded appointment of a receiver to carry out Defendant's obligations could not wait for an omnibus opinion resolving all of the parties' outstanding issues, and on April 24 I issued an order (the "Contempt Order") granting in part Plaintiff's Contempt Motion and appointing Rolin P. Bissell, Esq. as the receiver (the "Receiver").[58] The Receiver accepted his appointment on April 27.[59]

### C.   The Receiver Files His First Report.

The Receiver filed his first report on June 26, 2023.[60] He summarized his efforts over the preceding month to ensure Defendant is in compliance with the Court's orders. The Receiver observed that TAUC "has been slow to embrace" the Receiver's efforts.[61] "In particular, the Defendant seemed to continue to harbor the belief that the Plaintiff's right to information was inferior to the right held by other Managers."[62] "It also appeared that any information that was being circulated to the Plaintiff was not being circulated contemporaneously and often after some delay."[63] "Some progress has been made" and "[a]s a result, the Defendant is now providing

---

[57] D.I. 87; D.I. 88.

[58] D.I. 89 [hereinafter "Contempt Ord."] ¶¶ 1–2, 4.

[59] D.I. 91.

[60] D.I. 96 [hereinafter "Rpt."].

[61] *Id.* at 3.

[62] *Id.*

[63] *Id.* at 4.

more information and providing some of it more promptly."[64]   For example,

Defendant invited Plaintiff and the Receiver "to attend five, bi-weekly, half-hour

long Management Presentations.  The first was held on Monday, June 26."[65]

Nevertheless, the Company "still has substantial work to do to bring itself in

compliance with the Court's orders."[66]  I have reproduced below the Receiver's

findings on the Company's production of historical documents.

> The Receiver had hoped initially that any inadequacies in the Defendant's document production could be remedied by applying supplemental procedures to the work the Defendant had already done and that the document production would not need to be redone from scratch.  Regrettably, it is proving very hard to retrace the Defendant's steps.   There  are  no  memos  of  custodial  interviews,  written questionnaires, or other writings that the Receiver can review to understand what instructions custodians were given and what answers the custodians gave as to where to search for and collect potentially responsive documents.  Although search terms were used for five of seven custodians' email accounts, "targeted searches," rather than search terms, were used for two of the custodians. Reconstructing after-the-fact how the "targeting" was done will be a difficult task, and would likely require the undesirable task of interviewing the Defendant's attorneys on their recollection of how they did the targeting.  In addition, understanding hit reports and how search terms could be adjusted to develop more targeted and productive searches has been elusive.[67]

---

[64] *Id.*

[65] *Id.* at 5.

[66] *Id.*

[67] *Id.* at 6.

These subpar collection practices might explain some of the holes in Defendant's production and why it resisted Plaintiff's requests to produce hit reports.[68]

The Receiver also reported that Defendant's other managers were still withholding important managerial information from Plaintiff and failing to provide equal access. TAUC neglected to provide Plaintiff and the Receiver what amounts to a notice of default from its lender for nearly a month.[69] "According to the Plaintiff, rather than providing email communications contemporaneously, the Defendant's

---

[68] Defendant's counsel's explanation of their collection methods to the Court gave the impression that search terms were used across the board, and made no mention of "targeted searches." *E.g.*, D.I. 51 at 11 (representing at the March 11, 2022 post-trial status conference, "We did run search terms specifically for information related to the bolt-on acquisition."); D.I. 57 at 10 (representing at the November 1, 2022 post-trial status conference, "We have done a fulsome search. We used numerous search terms. We provided those search terms to Dr. Bruckel's attorneys for their input. They declined to give any. But nevertheless, based on their comments, we added additional search terms to our search. We looked at all documents that were returned, and we produced everything Your Honor ordered us to produce. It was not limited."); Mar. Brown Cert. ¶¶ 7–11 (indicating Defendant's counsel used search terms to collect documents); Apr. Brown Cert. ¶ 5 ("Counsel for TAUC used the same search terms that were used for the prior collection . . . ."); Contempt Hr'g Tr. 24 ("We have looked at the entire date range that was ordered. A production from February 12, 2021, to approximately the end of December 2021 was made in January of 2022, pursuant to your post-trial order, Your Honor, using search terms that Dr. Bruckel or his team were invited to participate in. They declined to provide any search terms, but they did make comments, and we incorporated additional search terms in response to those comments, including a search term to search for documents related to the bolt-on acquisition. That did, in fact happen, Your Honor. That statement was not accurate."); *id.* 26 ("We collected documents in December of 2021, ran search terms against those, and produced those in compliance with your order."); *id.* 44 ("We also had to involve Dr. Bruckel's counsel in the process, and that took time. They gave us new search terms. We ran them. We had to include them in the search scope.").

[69] Rpt. at 7 ("The Defendant received reservations of right (in essence a notice of technical default) from its lender, NXT, on May 3 and May 24, 2023. This was not reported to the Plaintiff or the Receiver until the June 1, 2023 Board meeting.").

14

counsel is withholding the majority of email communications and making any productions weeks to months later."[70]

Finally, the Receiver explained "[t]he parties have differing views on what the Receiver's role should be in the Defendant's determination and assertion of the attorney-client privilege and considering the Plaintiff's objections to the assertion of privilege."[71] The Receiver "request[ed] direction from the Court about what role, if any, the Receiver should have concerning Defendant's control and assertion of privilege, including whether the parties should raise the issue with the Court directly or whether the Court would like the Receiver to form a recommendation in the first instance that would be subject to Court review."[72]

## II. ANALYSIS

In the Contempt Order, I stated "[a] memorandum opinion will follow as to: (i) Defendant's contempt and any further sanctions; (ii) whether Defendant waived privilege, and (iii) whether Defendant carried its burden "to show cause as to why fees should not be shifted to Defendant in this matter."[73] This is that opinion.

---

[70] *Id.* at 9.

[71] *Id.* at 8.

[72] *Id.* at 9.

[73] Contempt Ord. ¶ 2 (citing Contempt Hr'g Tr. 54, 56, and *Bruckel*, 2023 WL 116483, at *5).

### A. Defendant Is In Contempt And Is Sanctioned For Such Contempt.

Court of Chancery Rule 70(b) authorizes the Court to make a contempt finding "[f]or failure . . . to obey or perform any order."[74] "When an asserted violation of a court order is the basis for contempt, the party to be sanctioned must be bound by the order, have clear notice of it, and nevertheless violate it in a meaningful way."[75] "Courts have inherent authority to enforce their own orders and judgments."[76] "The remedy of civil contempt serves two purposes: to coerce compliance with the order being violated, and to remedy injury suffered by other parties as a result of the contumacious behavior."[77] The Delaware Supreme Court has held that "[a] trial court has broad discretion to impose sanctions for failure to abide by [Court] orders," as long as the "decision to impose sanctions [is] just and reasonable."[78]

The Contempt Order found Defendant in contempt of the Post-Trial Opinion.[79] Defendant contemptuously failed to "produce to Plaintiff all books and

---

[74] Ct. Ch. R. 70(b).

[75] *TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 630, 644 (Del. 2022) (collecting cases), *cert. denied*, 143 S. Ct. 574 (2023).

[76] *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1183 (Del. Ch. 2009) (citing *Forsythe v. CIBC Empl. Private Equity Fund (U.S.) I, L.P.*, 2006 WL 846007, at *2 (Del. Ch. Mar. 22, 2006), and *Cebenka v. Upjohn Co.*, 559 A.2d 1219, 1225 (Del. 1989)).

[77] *Id.* at 1181 (citing *Del. State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978)).

[78] *Gallagher v. Long*, 940 A.2d 945, 2007 WL 3262150, at *2 (Del. 2007) (TABLE) (citing *Lehman Cap. v. Lofland*, 906 A.2d 122, 131 (Del. 2006)).

[79] Contempt Ord. ¶ 2 (citing Contempt Hr'g Tr. 54, 56).

records reasonably related to his status as a manager" including "non-privileged communications responsive to the Outstanding Requests to or by a manager communicating in his capacity as a manager relating to TAUC business, TAUC management meetings (formal or informal), or the bolt-on acquisition."[80]

At the December 2021 trial, the Court granted a partial inspection of: "communications establishing, preparing for, transmitting information for the purpose of, or documenting the weekly meetings of the four favored managers that have been occurring by Zoom;" "all materials transmitted in such communications and/or shares at the Zoom meetings," documents and communications reflecting "any action taken over email by those four managers in a managerial capacity not over Zoom," and "any communications or emails following up on or executing on tasks or decisions that were assigned or taken at those meetings."[81] In the January 6, 2023 Post-Trial Opinion, the Court ordered Defendant to produce documents in response to the Outstanding Requests. Defendant failed to make any production until March 13, 2023: three days after Plaintiff filed the Contempt Motion.[82] On December 2021 at the end of trial, the Court ordered Defendant to provide Plaintiff with equal access to managerial documents.[83] In response, Defendant's other

---

[80] *Bruckel*, 2023 WL 116483, at *4.

[81] Trial Tr. 319–20.

[82] Mar. Brown Cert. ¶ 12.

[83] Trial Tr. 318–19; *accord Bruckel*, 2023 WL 116483, at *2, *4.

managers changed the way they conducted business in order to evade their production responsibilities, by holding meetings with revolving missing managers.[84]

Defendant took the position that it had no obligation to produce managerial documents to Plaintiff on a go-forward basis.[85] The Post-Trial Opinion clarified that Defendant had ongoing obligations to provide Plaintiff "equal access to books and records related to [his] status as a manager."[86] Defendant failed to comply. For example, Defendant provided all the managers except for Plaintiff information about the proposed joint venture weeks before Plaintiff, who only received it one day before the Board met to vote on the venture.[87] At the Contempt Hearing, Defendant's counsel indicated this might have been an accident, and began to assure the Court that it wouldn't happen again.[88] It did happen again: after the Receiver

---

[84] *Bruckel*, 2023 WL 116483, at *4 ("Defendant's corporate representative Board Chair Ira Moreland testified that, following the Court's ruling at trial, Defendant's managers stopped meeting as an entire group, but instead began holding 'weekly group update[s]' in which the CEO and managers, to the exclusion of Plaintiff, would 'rotate in' to discuss TAUC business." (quoting Crib Sheet at 10)).

[85] *Id.* ("Remarkably, Defendant takes the position that it does not owe Plaintiff any documents dated after the trial in this matter, and seeks a 'final order stating that production is complete.' This position ignores Plaintiff's ongoing statutory inspection rights as a manager and contractual inspection rights as a Founder Member." (quoting D.I. 58 at 6)).

[86] *Id.*

[87] *Supra* note 36.

[88] Contempt Hr'g Tr. 34–35 ("[ATTORNEY BOOKHOUT:] I grant you, in this particular case of this one email, that there may have been an accident with respect to not getting it to Dr. Bruckel. And it won't happen -- THE COURT: I don't have an affidavit from your client saying it was an accident. ATTORNEY BOOKHOUT: I understand, Your Honor. What I can tell you is, with respect to the copying idea you just stated, I would be happy to

was appointed, "The Defendant received reservations of right (in essence a notice of technical default) from its lender, NXT, on May 3 and May 24, 2023. This was not reported to the Plaintiff or the Receiver until the June 1, 2023 Board meeting."[89] From the Receiver's frustration at this lack of information sharing, I infer a failure to share managerial documents about this technical default.[90] Defendant's failure to promptly share such documents with Plaintiff is further contempt. Defendant "has expressed regret that it failed to provide the [lender's] notices on a timely basis and indicated it will do better."[91] The regret rings hollow, and Defendant is out of runway to "do better" to comply with the Court's orders.[92]

Defendant also contemptuously ignored the Post-Trial Opinion ordering equal access when it proposed a Go-Forward Protocol that would produce books and records on a fourteen-business-day lag.[93] At the Contempt Hearing, I made clear

---

amend our go-forward protocol to make sure that what -- the email – the February 26th email does not happen again. I am sure -- I can guarantee -- THE COURT: And that was your responsibility after [the Post-Trial] opinion.").

[89] Rpt. at 7.

[90] *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, 2014 WL 897223, at *31 n.184 (Del. Ch. Mar. 5, 2014) ("White also is in contempt for violating the Preliminary Injunction because the evidence, such as Cinquanto's testimony and his June 12, 2013 report, supports the inference that White continued to use Wayman's property after the order was put in place.").

[91] Rpt. at 7.

[92] *See* Contempt Hr'g Tr. 35, 55.

[93] Regan Aff., Ex. 6 at 2, 6; Contempt Hr'g Tr. 30–31.

this was unacceptable, and that Defendant had to provide equal access.[94] The Contempt Order appointed the Receiver to facilitate this exact task and ordered "Defendant's managers, officers, employees, and agents [to] cooperate with the Receiver in the performance of his duties."[95] Defendant has contemptuously continued to produce documents only after a substantial delay.[96]

As a first sanction for Defendant's contempt, I appointed a receiver for three months to

> take all appropriate action to ensure Defendant's compliance with: (i) its obligation to respond to all Outstanding Requests for the entire date range articulated in the [Post-Trial] Opinion, including resolving issues related to search terms; and (ii) its ongoing obligation to produce all formal manager-level books and records to Plaintiff, and to the extent Defendant continues to conduct business informally, all informal Board materials, including resolving issues regarding the Go-Forward Protocol.[97]

---

[94] *Compare Bruckel*, 2023 WL 116483, at \*2, \*4 (ordering Defendant provide Plaintiff equal access to Board materials Defendant provided to other managers), *with* Regan Aff., Ex. 6 at 6 ("All documents shown, distributed, or used at formal or informal meetings of Board members will be provided to Dr. Bruckel within 14 business days of the meeting."), *and id.* ("The document will be provided to Dr. Bruckel within 14 business days of sharing with and/or viewing by, or meeting of, as applicable, the other Managers."), *and id.* at 2 (same), *and* Contempt Hr'g Tr. 16 ("Their go-forward protocol that they proposed after the motion was filed proposes that they should be able to withhold that information, the same information it's sharing with its other managers, from Dr. Bruckel for up to 14 business days, which is almost three weeks.").

[95] Contempt Ord. ¶ 7.

[96] *E.g.*, Rpt. at 6, 9.

[97] Contempt Ord. ¶¶ 5–6.

In connection with appointing the Receiver, I ordered that "Defendant shall pay the compensation and expenses of the Receiver at his customary hourly rate."[98] As the Contempt Order explained, the Receiver was appointed to coerce compliance with Defendant's obligations to Plaintiff, given the difficulty in achieving that compliance to date.

The Receiver's report indicates his appointment was not enough. Defendant's continued recalcitrance in producing documents to Plaintiff, manifested in delays in producing documents to Plaintiff and withholding information about the technical default from not only Plaintiff, but also the Receiver, compels the conclusion that stronger coercive measures are necessary. If upon the Receiver's August monthly report, Defendant has still ignored its obligations to provide Plaintiff equal access to Board materials, I will impose a per diem monetary sanction of $10,000 per day, payable to the Register in Chancery, for every day that Defendant is in contempt of the Post-Trial Opinion.[99]

---

[98] *Id.* ¶ 9.

[99] *Aveta*, 986 A.2d at 1188 (ordering a $20,000 per day sanction for every day beyond thirty days that defendant failed to comply with order); *State of Del. v. Indem. Ins. Corp, RRG*, C.A. No. 8601-VCL, D.I. 161 ¶ 5 (Del. Ch. Sept. 25, 2013) (ORDER) (imposing $10,000 per day sanction until party complied with the Court's order); *State of Del. v. Indem. Ins. Corp, RRG*, C.A. No. 8601-VCL, D.I. 217 ¶ 7 (Del. Ch. Nov. 1, 2013) (ORDER) (imposing $10,000 per day sanction payable to the Register in Chancery until party complied with the Court's order).

### B. Where Defendant's Amended Log Is Deficient, Defendant Must Produce Those Documents.

At the Contempt Hearing, I was prepared to ask Defendant's Delaware counsel about Plaintiff's concerns with Defendant's privilege log.[100] Defendant's Delaware counsel was not prepared to respond to the Court's questions.[101] I asked the parties to update the Court on the privilege log issues.[102]

On April 17, Defendant provided an amended privilege log (the "Amended Log") and produced 265 documents it had dropped from the original log.[103] According to Plaintiff, the Amended Log "reflects hundreds of additions to the privilege log" and "reflects 786 total entries."[104] Plaintiff contends "[t]he primary global issue as articulated in the deficiency letter, and during [the Contempt Hearing], is that [Defendant] has not established the existence of a cognizable legal adversity between it and Dr. Bruckel with respect to broad categories of withheld documents."[105] Plaintiff argues Defendant "has not explained, either in its response to the deficiency letter or at the meet and confer, its basis for asserting that a far-reaching legal adversity exists between Dr. Bruckel and [Defendant] enabling it to

---

[100] Contempt Hr'g Tr. 35.

[101] *Id.* 36.

[102] *Id.* 57.

[103] D.I. 87 at 4; D.I. 87, Ex. 2 [hereinafter "Am. Log"]; D.I. 87, Ex. 4.

[104] D.I. 87 at 4 & n.6 (emphasis omitted).

[105] *Id.* at 4.

deprive him, a sitting manager, of the documents—relating to TAUC business—that it has withheld notwithstanding their provision to other managers and other non-managers."[106]

Defendant responded that "[t]he overwhelming majority of the remaining entries on the [Amended Log] relate to this litigation and/or [other litigation between the parties in Missouri]."[107]  Defendant asserts entries on the Amended Log fall into the following categories in which Plaintiff is adverse to Defendant:

1. "Directly concerning this DE Lawsuit primarily including communications between attorney(s) and client regarding same";

2. "Directly concerning the DE Lawsuit, but includes other privileged communications in which Dr. Bruckel is also adverse to TAUC";

3. "Related to the DE Lawsuit, as described in the log, because counsel is providing legal advice related to responding to requests for documents and/or information from Dr. Bruckel, which is the heart of the dispute before the DE Court.  These documents were sent during [the] DE Lawsuit and concerned the same subject matter";

4. "Related to the DE Lawsuit because counsel is providing legal advice concerning emails from Dr. Bruckel regarding same issues in dispute in DE before the Court";

5. "Directly concerning the MO Lawsuit, primarily including communications between attorney(s) and client regarding same";

6. "Related to MO Lawsuit, as described in the log, including advice related to continuation of business with TAUC Properties, LLC, which is a company owned and controlled by Dr. Bruckel and is another plaintiff in the MO Lawsuit";

---

[106] *Id.* at 5.

[107] D.I. 88 at 4.

7. "Directly related to the investigation by the Federal Government, of which Dr. Bruckel was a subject";

8. "Directly related to dispute between TAUC and Dr. Bruckel regarding physician identification numbers and DEA and BNDD registration";

9. "Related to insurance claims for which coverage matters in which Dr. Bruckel is adverse to TAUC, including disclosures of information as needed to insurers regarding the DE and MO Lawsuits"; and

10. "Related to matters where Dr. Bruckel is and/or is potentially a direct adversary, which include his potential involvement in lawsuits against the Company, his demand for direct distributions, and his request for approval to transfer his shares to his trust[.]"[108]

"The attorney-client privilege promotes justice by encouraging candor between clients and their attorneys."[109] The attorney-client privilege is codified in Delaware Rule of Evidence 502.[110] "The burden of establishing that otherwise discoverable information is privileged rests on the party asserting the privilege."[111]

---

[108] D.I. 88, Ex. A.

[109] *Buttonwood Tree Value P'rs, L.P. v. R.L. Polk & Co.*, 2018 WL 346036, at *2 (Del. Ch. Jan. 10, 2018) (citing *Wal–Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1278 (Del. 2014), and *Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993)).

[110] D.R.E. 502.

[111] *Mechel Bluestone, Inc. v. James C. Just. Cos., Inc.*, 2014 WL 7011195, at *4 (Del. Ch. Dec. 12, 2014) (internal quotation marks omitted) (collecting cases).

> [A] bare allegation that information and documents are protected from discovery by . . . privilege is insufficient without making more information available. . . . It is incumbent on one asserting the privilege to make a proper showing that each of the criteria [underlying the privilege] exist[s]. . . . A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality.[112]

"As a general rule, a corporation cannot assert attorney-client privilege 'to deny a director access to legal advice furnished to the board during the director's tenure.'"[113] "Members of a board are charged with 'the proper management of the corporation' and 'treated as the "joint client" when legal advice is rendered to the corporation through one of its officers or directors.'"[114] "[P]rivileged information can be withheld from a director 'once sufficient adversity exists between the director and the corporation such that the director could no longer have a reasonable expectation that he was a client of the board's counsel.'"[115]

---

[112] *Id.* (formatting original) (quoting *Int'l Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 93–94 (D. Del. 1974)).

[113] *SerVaas v. Ford Smart Mobility LLC*, 2021 WL 5226487, at *2 (Del. Ch. Nov. 9, 2021) (quoting *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at *4 (Del. Ch. June 4, 1996)).

[114] *Id.* at *3 (Del. Ch. Nov. 9, 2021) (quoting *Moore*, 1996 WL 307444, at *4).

[115] *Id.* at *2 (Del. Ch. Nov. 9, 2021) (quoting *Kalisman v. Friedman*, 2013 WL 1668205, at *5 (Del. Ch. Apr. 17, 2013)).

"An improperly asserted claim of privilege is no claim at all. It's waived."[116] "[H]iding non-privileged information on a privilege log poses a risk of severe prejudice to the party subjected to discovery abuse."[117] Where a privilege log is not prepared in a good faith attempt to comply with Delaware law, in a "conscious effort to render a log so devoid of content," and the party responsible refuses to correct it, this Court may find that party has waived its privilege.[118] Where counsel makes some effort, the Court will not impose a blanket waiver and instead only waive privilege as to the deficient entries.[119]

Defendant's Amended Log presents several issues. I take them in turn.

### 1. Redactions

Defendant did not produce a redaction log. It appears Defendant chose to designate entire documents as privileged instead of redacting privileged information.

Documents that are only partially privileged should not be withheld in their entirety.

---

[116] *Klig v. Deloitte LLP*, 2010 WL 3489735, at *4 (Del. Ch. Sept. 7, 2010) (internal quotation marks and citation omitted); *accord Int'l Paper*, 63 F.R.D. at 94; *Reese v. Klair*, 1985 WL 21127, at *5 (Del. Ch. Feb.20, 1985).

[117] *Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 300150, at *2 (Del. Ch. Jan. 18, 2023) (ORDER).

[118] *Klig*, 2010 WL 3489735, at *5.

[119] *Mechel Bluestone*, 2014 WL 7011195, at *8 (declining to waive the entire log because the defendant made some small effort to fix the log when plaintiff raised the deficiencies, so the court just found the remaining deficient entries waived).

A party that redacts the entirety of a document, except for their Bates numbers, is not using the redaction tool in good faith. Redaction enables a party to produce a document that partially contains privileged matter. Redactions must be targeted to address only the privileged matter so that the non-privileged portion is produced.[120]

"Not every communication where a lawyer is copied warrants the assertion of privilege."[121] And even where documents "do properly contain privileged or work-product information," parties should not "with[o]ld the document entirely or grossly over-redact[] it."[122]

As an example, in *Agar v. Judy*, the Court instructed the parties regarding "a situation where [the] document was withheld in its entirety, i.e. marked 'privileged' not marked 'redacted.'"[123]

---

[120] *Id.*

[121] *Thermo Fisher*, 2023 WL 300150, at *3.

[122] *Id.* at *7 (citing *MPEG LA, L.L.C. v. Dell Glob. B.V.*, 2013 WL 6628782, at *2 (Del. Ch. Dec. 9, 2013)); *accord MPEG LA*, 2013 WL 6628782, at *2 ("[T]he communication will be considered privileged only if the legal aspects predominate." (collecting cases)); *In re R1 RCM Inc. S'holders Litig.*, Consol. C.A. No. 2021-0318-PAF, D.I. 327 at 13 (Del. Ch. June 16, 2023) (TRANSCRIPT) ("I also note that some redactions appear facially overbroad. For example, Exhibits 19, 20, and 27 redact documents in whole despite the concession that they contain input from nonlawyers.").

[123] C.A. No. 9541-VCL, D.I. 450 at 18 (Del. Ch. July 23, 2021) (TRANSCRIPT).

So when you're redacting emails, you need to redact selectively. Which means, don't redact that stuff because that stuff isn't privileged. What I really want you to do is only redact the stuff that's privileged. For example, in your hypothetical, one would not redact any of the email headers. One would start with the email text. And in the text section, one might see a part that says "Attached is the assignment agreement." That's not privileged. That's a transmittal email. It's not advice. It's just "Here it is." Then if they go in and say, "I recommend that you not sign this" -- insert legal rationale -- sure, redact that. But all the full-page redactions do[] is make things hard.[124]

In *Thermo Fischer Scientific PSG Corporation v. Arranta Bio MA, LLC*, the Court reviewed the plaintiff's privilege log in camera, and granted in part a motion to compel after finding the log "riddled with errors."[125] The Court gave dozens of examples of deficiencies,[126] including:

Entry 737 is a chain of seven emails that is entirely withheld on privilege grounds, with the generic description: "Email containing legal advice from counsel regarding negotiation of the supply agreement with Arranta to manufacture plasmids for Thermo Fisher." Six of the seven emails in the chain are between Plaintiff and Defendant, and one line in the last email in the chain could have been redacted.[127]

---

[124] *Id.* at 20.

[125] 2023 WL 300150, at *9; *id.* ("The problems with Plaintiff's log are so pervasive that I could—and arguably should—grant Defendant's request for relief as to the entirety of Plaintiff's log.").

[126] *Id.* at *4–9; *id.* at *7–8 (summarizing email chains which were improperly withheld as privileged in their entirety where only certain lines needed to be redacted).

[127] *Id.* at *7.

Here, Defendant made several attempts at a privilege log.[128] The deficiencies persist. For example, emails from Plaintiff's counsel that were then forwarded to Defendant's counsel are better suited for redaction than withholding.[129] Of the 786 total entries on the Amended Log, only forty-two entries indicate they contain redactions and the description for each reads: "[REDACTED] Attachment to email among clients discussing invoices of vendor hired by outside counsel related to investigation by the Federal Government regarding matters involving action by Dr. Bruckel."[130] Where Defendant withheld documents that should have only been partially redacted, including but not limited to email chains that contain emails sent by Plaintiff or his counsel,[131] I find it did so in bad faith. They should be produced in full.

---

[128] *E.g.*, Regan Aff., Ex. 7; Regan Aff., Ex. 8; Am. Log.

[129] *E.g.*, Am. Log at PRIVTAUC0000776 ("Email from client to outside counsel in connection with legal advice being provided by outside counsel related to response to letter from counsel for Dr. Bruckel related to payment for the redemption of equity related to TAUC Properties, LLC"); *see also* PRIVTAUC0000778, PRIVTAUC0000801.

[130] Am. Log at TAUC0010504–541, TAUC0011006–045; TAUC0011811–848, TAUC0011872–963, TAUC0011986–12025.

[131] In the Court's estimation, the following are examples of this phenomenon. *E.g.*, Am. Log at PRIVTAUC0000479–492, PRIVTAUC0000524–525, PRIVTAUC0000527–536, PRIVTAUC0000547–549, PRIVTAUC0000569, PRIVTAUC0000590–597, PRIVTAUC0000614–625, PRIVTAUC0000628–635, PRIVTAUC0000643–648, PRIVTAUC0000656–659, PRIVTAUC0000663–665, PRIVTAUC0000675–676, PRIVTAUC0000685, PRIVTAUC0000687, PRIVTAUC0000690–691, PRIVTAUC0000756–762, PRIVTAUC0000764–765, PRIVTAUC0000801, PRIVTAUC0000807, PRIVTAUC0000872, PRIVTAUC0000910–911, PRIVTAUC0000920–924, PRIVTAUC0000926–930.

## 2. Attachments

Many entries on the Amended Log for attachments to emails concern attachments to privileged emails that themselves do not appear privileged: Defendant withheld attachments without logging why they were privileged, instead only adding the prefix "Attachment to" to the logged email's description.[132]

Many attachments appear to be .png, .jpg, or .jpeg files.[133] The Amended Log

---

[132] *Mechel Bluestone*, 2014 WL 7011195, at \*7; *E.g.*, *compare* Am. Log at PRIVTAUC0000406 (describing an email with the subject "RE: TAUC – Supplemental Claim Notice to Bruckel" as "Email from client to outside counsel in connection with legal advice being provided by outside counsel related to indemnification claim against Dr. Bruckel"), *with id.* at PRIVTAUC0000407 (describing an attachment with the file name "Doc – Feb 11 2022 – 3-33 PM.pdf" as "Attachment to email from client to outside counsel in connection with legal advice being provided by outside counsel related to indemnification claim against Dr. Bruckel"); *compare id.* at PRIVTAUC0000683 (describing an email with the subject "Fwd: Attorney Client Privilege" as "Email from client to outside counsel in connection with legal advice being provided by outside counsel related to potential involvement of Dr. Bruckel in a potential lawsuit"), *with id.* at PRIVTAUC0000684 (describing an attachment with the file name "DOC111422-11142022180730.pdf" as "Attachment to email from client to outside counsel in connection with legal advice being provided by outside counsel related to potential involvement of Dr. Bruckel in a potential lawsuit").

[133] Am. Log at PRIVTAUC0000344, PRIVTAUC0000350–351, PRIVTAUC0000360–361, PRIVTAUC0000366, PRIVTAUC0000371, PRIVTAUC0000386–387, PRIVTAUC0000399, PRIVTAUC0000409, PRIVTAUC0000427, PRIVTAUC0000439, PRIVTAUC0000443, PRIVTAUC0000445–446, PRIVTAUC0000505, PRIVTAUC0000539, PRIVTAUC0000541, PRIVTAUC0000543–544, PRIVTAUC0000560, PRIVTAUC0000572, PRIVTAUC0000576, PRIVTAUC0000578–579, PRIVTAUC0000611–612, PRIVTAUC0000637–639, PRIVTAUC0000650–651, PRIVTAUC0000696, PRIVTAUC0000724–725, PRIVTAUC0000737, PRIVTAUC0000739, PRIVTAUC0000745, PRIVTAUC0000773, PRIVTAUC0000775, PRIVTAUC0000780, PRIVTAUC0000800, PRIVTAUC0000810, PRIVTAUC0000819–820, PRIVTAUC0000824, PRIVTAUC0000827, PRIVTAUC0000835–36, PRIVTAUC0000841, PRIVTAUC0000851–852, PRIVTAUC0000857–864, PRIVTAUC0000885–890, PRIVTAUC0000913–916, PRIVTAUC0000937–938,

includes seventy-six entries with the file name "image001," twenty with the file name "image002," three named "image003," and one of both "image004" and "image0."[134]  None of these entries indicate those attachments are a screenshot or scan of privileged or protected work.[135]  The Amended Log does not indicate they are anything other than "[a]ttachment[s]."  Other attachments are calendar invitations and acceptances.[136]  The calendar invitations and acceptances are not privileged.[137]  Other attachments are docketed litigation filings:[138]  these are not

---

PRIVTAUC0000942–943, PRIVTAUC0000957–958, PRIVTAUC0000964–965, PRIVTAUC0000967–968, PRIVTAUC0000970–973, PRIVTAUC0000987, PRIVTAUC0000989, PRIVTAUC0001002, PRIVTAUC0001004–005, PRIVTAUC0001032, PRIVTAUC0001048–049, PRIVTAUC0001054, PRIVTAUC0001057, PRIVTAUC0001060–061, PRIVTAUC0001063–064, PRIVTAUC0001066, PRIVTAUC0001068.

[134] *Supra* note 133.

[135] *E.g.*, Am. Log at PRIVTAUC0000773 (designating an attachment with the file name "image001.png" as privileged and describing it as "Attachment to email from client to outside counsel in connection with legal advice being provided by outside counsel related to status of lawsuit with Dr. Bruckel").

[136] Am. Log at PRIVTAUC0000499–501, PRIVTAUC0000626–627, PRIVTAUC0000666–672, PRIVTAUC0000767–768.

[137] *Thermo Fisher*, 2023 WL 300150, at *5 n.3 ("A similar improper example of Plaintiff's assertion of privilege is entry 408, which is solely a non-privileged Webex meeting invitation.").

[138] *E.g.*, Am. Log at PRIVTAUC0000412, PRIVTAUC0000694, PRIVTAUC0000698, PRIVTAUC0000704, PRIVTAUC0000729, PRIVTAUC0000747–750, PRIVTAUC0000939, PRIVTAUC0000945, PRIVTAUC0000954, PRIVTAUC0000962, PRIVTAUC0000966, PRIVTAUC0000974, PRIVTAUC0000981, PRIVTAUC0000983, PRIVTAUC0000985, PRIVTAUC0000988, PRIVTAUC0000991, PRIVTAUC0001015.

privileged, either.[139]

Defendant's Amended Log also designated three sets of Board meeting minutes, and Plaintiff's "corporate proxy," as privileged.[140] Defendant's initial log had designated more minutes as privileged. Defendant does not assert how Plaintiff, a member of the Board, is adverse as to meeting minutes in their entirety; indeed, the other managers' sustained and improper practice of not disclosing Board materials to Plaintiff is at the heart of this case.[141] Having failed to substantiate any basis for withholding these documents as privileged, Defendant must produce these documents to Plaintiff.

### 3. Documents From Plaintiff Or Plaintiff's Counsel

Finally, Defendant logged as privileged documents either Plaintiff or his

---

[139] *Cf. Raley v. Stango*, 1985 WL 165739, at *1 (Del. Ch. Sept. 13, 1985) ("[I]f the attorney's communication is based solely on public documents or sources other than the client's disclosures, the communication is not privileged." (citing *Sperti Prods., Inc. v. Coca Cola Co.*, 262 F.Supp. 148 (D. Del. 1966))).

[140] Am. Log at PRIVTAUC0000518, PRIVTAUC0000558, PRIVTAUC0000562, PRIVTAUC0000763.

[141] *See id.* at PRIVTAUC0000550 (designating an email with the subject "Fwd: Management Agreement 3930074" between two TAUC employees, and no attorneys as attorney work product, and describing it as "Email among clients discussing insurance coverage related to lawsuit with Dr. Bruckel"); *id.* at PRIVTAUC0000555 (same, but also among TAUC's Board Chair); *id.* at PRIVTAUC0000551 (designating an attachment with the file name "3930074_7_11_ror.doc" as attorney work product, and as "Attachment to email among clients discussing insurance coverage related to lawsuit with Dr. Bruckel"); *id.* at PRIVTAUC0000556 (same).

counsel had sent or emails on which his counsel was copied.[142]  Obviously,

communications and documents that were sent to or by either Plaintiff or his counsel

are not privileged as to him.[143]  Those documents must be produced.

### 4. Defendant And Its Counsel Maintain Control Over The Assertion Of TAUC's Privilege.

As I stated in the Contempt Order, Defendant and its Delaware counsel

maintain ultimate responsibility over the assertion of TAUC's privilege.[144]  I caution

Defendant and its counsel, particularly Delaware counsel, to use Delaware law and

this opinion as guidance for future assertions, and possible consequences for

misdesignations.  They may not offload this duty to the Receiver.  Should the parties

again dispute the propriety of Defendant's privilege designations, I invite them to

file a motion.  Future findings of waiver may be broader than this opinion's lenient

document-by-document and issue-by-issue waivers.

---

[142] *E.g.*, *id.* at PRIVTAUC0000428, PRIVTAUC0000435–437, PRIVTAUC0000440–442, PRIVTAUC0000447–449, PRIVTAUC0000519, PRIVTAUC0000553–554, PRIVTAUC0000777, PRIVTAUC0000802, PRIVTAUC0000808, PRIVTAUC0000832, PRIVTAUC0000925, PRIVTAUC0001036–046.

[143] *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010) ("Generally, the 'attorney-client privilege generally protects the communications between a client and an attorney acting in his professional capacity . . . [.]'" (quoting *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992))); D.R.E. 502(b).

[144] Contempt Ord. ¶ 6.

## C. Plaintiff's Fees And Expenses In This Action Are Shifted To Defendant.

As I explained in the Post-Trial Opinion, this Court retains discretion to shift fees for bad faith conduct "to deter abusive litigation and protect the integrity of the judicial process."[145] I instructed Defendant to show cause why fees should not be shifted under the bad faith exception.[146] On January 26, Defendant filed its written submission attaching thirty-two exhibits.[147] On February 9, Plaintiff responded.[148]

> The bad faith exception to the American Rule applies in cases where the court finds litigation to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation. There is no single standard of bad faith that warrants an award of attorneys' fees in such situations; rather, bad faith is assessed on the basis of the facts presented in the case. Courts have found bad faith conduct where parties have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims.[149]

In *Pettry v. Gilead Sciences, Inc.*, this Court granted the Section 220 plaintiffs leave to move for fee-shifting where the defendant "exemplified the trend of overly

---

[145] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG* (*Johnson II*), 720 A.2d 542, 546 (Del. 1998)).

[146] *See Bruckel*, 2023 WL 116483, at *5.

[147] D.I. 64; D.I. 65; D.I. 66; D.I. 67; D.I. 68; D.I. 69; D.I. 70; D.I. 71.

[148] D.I. 74.

[149] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850–51 (Del. Ch. 2005) (footnotes omitted) (citing *Arbitrium (Cayman Is.) Handels v. Johnston* (*Johnson I*), 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd* (*Johnson II*), 720 A.2d 542, and *Jacobson v. Dryson Acceptance Corp.*, 2002 WL 31521109, at *16 (Del. Ch. Nov. 1, 2002), and *Johnston II*, 720 A.2d 542).

aggressive litigation strategies by blocking legitimate discovery, misrepresenting the record, and taking positions for no apparent purpose other than obstructing the exercise of Plaintiff's statutory rights" to books and records.[150] The Court then granted the plaintiffs' motion to shift fees "infer[ing] bad faith based on the litigation conduct alone."[151] Where a plaintiff has "a clearly established legal right to inspect [the defendant company's] books and records, and [the company's] conduct forced him to bring [an] action to secure that right, then the defendant can be found to have acted in bad faith and be ordered to pay the plaintiff's legal fees and expenses."[152]

Defendant forced Plaintiff to file suit to vindicate his rights and then persistently defied those rights.[153] Defendant asserted at trial that it could refuse to produce books and records because Plaintiff "was not motivated by a proper purpose."[154] This contention ignores Plaintiff's contractual rights under the

---

[150] (*Gilead I*), 2020 WL 6870461, at *30 (Del. Ch. Nov. 24, 2020).

[151] *Pettry v. Gilead Scis., Inc.* (*Gilead II*), Consol. C.A. No. 2020-0132-KSJM, D.I. 132 at 6 (Del. Ch. July 22, 2021).

[152] *McGowan v. Empress Ent., Inc.*, 791 A.2d 1, 4 (Del. Ch. 2000); *id.* (holding that the defendant "acted in subjective bad faith by failing to honor its promises to produce its books and records, and later by opposing [the plaintiff's] § 220 action to enforce his legal right to inspect those books and records," despite there being no record of the defendant's state of mind).

[153] *See id.*

[154] D.I. 64 at 19–23.

operating agreement and broad rights as a manager.[155] In the Post-Trial Opinion, I found Plaintiff has "essentially unfettered" statutory rights as a manager and "unbounded contractual rights" to Defendant's books and records.[156]

Defendant was not forthcoming with information about its documents that Plaintiff was entitled to understand. First, Defendant failed to identify manager-level books and records that existed, suggesting that TAUC business conducted by the other managers to Plaintiff's exclusion were not Board materials.[157] In an effort to resolve the issue, the Court endorsed a Rule 30(b)(6) deposition so that Plaintiff could identify what managerial documents existed.[158]

Defendant also refused to respond to Plaintiff's valid request for a hit report encompassing the full date range ordered in the Post-Trial Opinion. The Receiver's report has given some insight into why.[159] The "Outstanding Requests" ordered in that Post-Trial Opinion sought communications dating back to February 12, 2021, and remained outstanding even after Defendant's initial January 25, 2022

---

[155] LLC Agr. § 11.1(c); Trial Tr. 318 ("He also has a contractual right that doesn't have that proper-purpose restriction."); *Obeid v. Gemini Real Estate Advisors, LLC*, 2018 WL 2714784, at *4 (Del. Ch. June 5, 2018) ("A director's right of access is 'essentially unfettered in nature.'" (quoting *Kalisman*, 2013 WL 1668205, at *3, and citing *Intrieri v. Avatex Corp.*, 1998 WL 326608, at *1 (Del. Ch. June 12, 1998))).

[156] *Bruckel*, 2023 WL 116483, at *5 (internal quotation marks omitted) (quoting *Kalisman*, 2013 WL 1668205, at *3, and citing LLC Agr. § 11.1(c)).

[157] *See* D.I. 51 at 10–11.

[158] *Id.* at 14–15.

[159] *See* Rpt. at 6.

production.[160]  In pursuing the Outstanding Requests, Plaintiff requested a hit report reflecting the full date range ordered in the Post-Trial Opinion; Defendant refused, asserting it already produced any responsive documents in the early days of that date range in its initial production.[161]  But Defendant had not yet certified its initial production was complete, so Plaintiff could not know whether that production complied with the Post-Trial Opinion's order.[162]  Indeed, Defendant did not certify any of its production until March 20, 2023:  nearly fourteen months after its initial production, ten days after Plaintiff's Contempt Motion, and seven days after its first production following the Post-Trial Opinion.[163]

Once ordered to produce documents to Plaintiff, Defendant went to extraordinary lengths to avoid its ongoing obligations.[164]  The Rule 30(b)(6)

---

[160] *Bruckel*, 2023 WL 116483, at *3.

[161] Regan Aff., Ex. 1 at 2–3, 5; Mar. Brown Cert. ¶¶ 3–5; *see also* Contempt Hr'g Tr. 24–26.

[162] *Compare* Regan Aff., Ex. 1 at 2, 5, 7–8 (requesting in January and February 2023 that Defendant provide hit reports from February 12, 2021 to date), *with* Apr. Brown Cert. (certifying Defendant's March 13, 2023 production was "complete as of January 6, 2023" on March 20, 2023).

[163] Mar. Brown Cert. ¶ 15 ("Based on the collection, review, and production described above, production is complete as of January 6, 2023); *see also id.* ¶ 16 ("Counsel for TAUC will submit an additional certification when the collection, review, and production of documents dated January 7, 2023 through March 3, 2023 is complete."); Apr. Brown Cert. ¶ 7 ("Based on the collection, review, and production described above and in the previous certification, production is complete as of March 3, 2023.").

[164] *Bruckel*, 2023 WL 116483, at *5 ("In spite of these rights, Defendant has not been forthcoming with its production.  Its defenses at trial bordered on specious:  maligning Plaintiff's purpose for seeking documents when that is not a requirement under Section

deposition revealed Defendant's other managers met to perform their managerial duties without Plaintiff, and without one additional manager on a rotating basis, over sixty times since trial.[165]  I find they did so in a bad faith attempt to manage TAUC without generating official Board materials, in order to represent to Plaintiff that no Board meetings were held or no Board materials existed.[166]  And even after being told to provide equal access, Defendant took the remarkable position that it did not owe Plaintiff any documents dated after the trial.[167]

---

18-305 or the LLC Agreement; maligning the format of his demand letter and demanding a power of attorney; and feigning ambiguity in Plaintiff's document requests.  Nor has Defendant been forthcoming with information about how the managers conduct business or what documents exist.  Defendant has reportedly gone so far as to change how its managers conduct business to duck the Court's suggested parameters for identifying books and records that had to be produced.  And Defendant has taken an astonishing position that it need only produce books and records through trial in this matter, even though Plaintiff's inspection rights are ongoing." (footnotes omitted)).

[165] *Supra* notes 16 and 17.

[166] *See Winshall v. Viacom Int'l, Inc.*, 55 A.3d 629, 639 (Del. Ch. 2011) (recognizing a party "cannot avoid its contractual obligations by creating, in bad faith, an outcome that technically satisfies the express terms of the [contract], but deprives plaintiffs of their legitimate expectations" (internal quotation marks and citations omitted)), *aff'd,* 76 A.3d 808 (Del. 2013); *In re Grupo Dos Chiles, LLC*, 2006 WL 2507044, at *1 (Del. Ch. Aug. 17, 2006) ("An exception [to the American Rule] exists in equity . . . when it appears that a party or its counsel has proceeded in bad faith, has acted vexatiously, *or has relied on misrepresentations of fact or law in connection with advancing a claim in litigation*." (emphasis added) (internal quotation marks omitted) (quoting *Rice v. Herrigan–Ferro*, 2004 WL 1587563, at *1 (Del. Ch. July 12, 2004))).

[167] D.I. 58 at 6.

Under *Gilead*, *McGowan*, and *Marilyn Abrams Living Trust*, Defendant's litigation conduct is sufficient to infer subjective bad faith.[168]  In spite of Plaintiff's "clearly established legal right" to inspect TAUC's books and records, Defendant "forced him to bring [an] action to secure that right,"[169] then argued that Plaintiff lacked a proper purpose as a "pretext" to deny his inspection rights when no proper purpose was necessary.[170]   Defendant then took the "glaring[ly] egregious[]" position that its obligations ended at trial.[171]  It also modified how it conducted business in an effort to "misrepresent[]" the universe of Board materials and "obstruct[] the exercise of Plaintiff's statutory [and contractual] rights."[172]

Defendant relies on *Zheng v. San Yang Asia Supermarket, LLC* to argue even "hostile" and "bullying" responses to a books and records demand, and insisting on formal litigation,[173] does not warrant fee shifting as long as the defendant's position

---

[168] *Gilead II*, Consol. C.A. No. 2020-0132-KSJM, D.I. 132 at 6; *McGowan*, 791 A.2d at 4; *The Marilyn Abrams Living Tr. v. Pope Invs. LLC*, C.A. No. 12829-VCL, D.I. 38 at 14–16 (Del. Ch. Mar. 21, 2017) (ORDER).

[169] *McGowan*, 791 A.2d at 4.

[170] *See Marilyn Abrams*, C.A. No. 12829-VCL, D.I. 38 at 14–15.

[171] *Gilead II*, Consol. C.A. No. 2020-0132-KSJM, D.I. 132 at 2 (collecting cases).

[172] *Gilead I*, 2020 WL 6870461, at *30.

[173] C.A. No. 2020-0447-MTZ, D.I. 38 at 11 (Del. Ch. Jan. 27, 2021) (TRANSCRIPT).  *But see McGowan*, 791 A.2d at 4 ("If McGowan had a clearly established legal right to inspect Empress's books and records, and Empress's conduct forced him to bring this action to secure that right, then the defendant can be found to have acted in bad faith and be ordered to pay the plaintiff's legal fees and expenses." (internal quotation marks omitted)); *Gilead II* Consol. C.A. No. 2020-0132-KSJM, D.I. 132 at 3 n.7 (same) (quoting *McGowan*, 791 A.2d at 4).

was not "held or wielded insincerely or in bad faith," and that the defendant "resisted [production] based on a tenuous, but genuinely held and consistently applied, basis."[174] Defendant asserts the Court should decline to shift fees because it behaved better than the *Zheng* defendant, whose behavior went unpunished.[175]

*Zheng* is distinguishable because "[t]he plaintiff [wa]s not a director of a corporation entitled to unfettered access."[176] Here, not only is Plaintiff entitled to statutory unfettered access to documents related to his position as manager, like the plaintiff in *McGowan*, but he also has contractual rights that are not tied to a proper purpose requirement.[177] As in *Marilyn Abrams*, Defendant could not meaningfully use a supposed lack of a proper purpose to deny Plaintiff's information rights.

Defendant also argued fee shifting is inappropriate because "there is no evidence of bad faith in defense of this action, let alone the required clear evidence of subjective bad faith."[178] In support of this assertion, Defendant points to the books and records they slowly and eventually produced, the lack of motion practice, and

---

[174] D.I. 64 at 24–26 (internal quotation marks omitted) (quoting *Zheng*, C.A. No. 2020-0447-MTZ, D.I. 38 at 7–9, 10–12).

[175] *Id.* at 25–26.

[176] *Zheng*, C.A. No. 2020-0447-MTZ, D.I. 38 at 9; *id.* ("This case resembles *Mickman* [*v. American International Processing*, C.A. No. 4368-VCP, D.I. 55 (Del. Ch. Oct. 28, 2010)] more than *McGowan* and *Marilyn Abrams*.").

[177] *McGowan*, 791 A.2d at 5; *Bruckel*, 2023 WL 116483, at *2 (quoting Trial Tr. 318); LLC Agr. § 11.1(c).

[178] D.I. 64 at 1.

the fact that "[t]o the best of TAUC's knowledge," Plaintiff has never asked to inspect books and records on site or requested to copy documents.[179] These arguments are unavailing. That Defendant produced some—but not all—of the documents to which Plaintiff had a right, does not outweigh Defendant's conduct. After the December 14, 2021 trial, Defendant produced an incomplete tranche of documents on January 25, 2022.[180] In spite of its obligations, it refused to produce any additional documents until March 13, 2023.[181] And the lack of formal motions is an illusory fact that belies the intensity with which Defendant litigated this matter: in what is supposed to be a summary proceeding, the docket is littered with letters, and the Court has had a trial, three subsequent hearings, and issued now five rulings.[182] Finally, Defendant misstates the record: Plaintiff did request to inspect documents on site.[183]

---

[179] *Id.* at 3–11, 14.

[180] *Id.* at 10 (citing Exhibit P to Defendant TAUC Holdings, LLC's Written Submission Regarding Attorneys' Fees).

[181] D.I. 58 at 3, 5; D.I. 58, Ex. 1 at 3 (emailing Plaintiff's counsel on November 7, 2022 "Finally, there is no basis, almost a year after the trial in this matter, for your request to expand the time period at issue"); Mar. Brown Cert. ¶ 12.

[182] D.I. 44; Trial Tr.; D.I. 50; D.I. 51; D.I. 56; D.I. 57; D.I. 60; D.I. 85; Contempt Ord.; Hr'g Tr.

[183] JX 4 at TAUC0000596 (asking TAUC to respond to the demand "by either providing these records or indicating a time and place at which my representatives and I can access these records"); *see also* D.I. 43, Ex., Deposition Transcript of Matthew M. Bruckel, M.D., at 49 (testifying: "[I]f you give me a company computer with access to the files, I can -- I can do it all on my own. I -- I don't need anyone to do any work for me."); Trial Tr. 67 (testifying: "[G]ive me access to the computer files[,] I'll do the work myself").

Defendant has failed to show cause to prevent fees from being shifted. Plaintiff is awarded his reasonable fees and expenses in bringing this action. Plaintiff's counsel should submit affidavits attaching detailed invoices in support of their fees within ten days of this opinion.

### D. The Court Will Assess The Reasonableness Of Plaintiff's Fees Incurred In Bringing The Contempt Motion When It Assesses Plaintiff's Fees In The Action As A Whole.

In the Contempt Order, I awarded Plaintiff his reasonable fees and expenses bringing the Contempt Motion, "without prejudice to any other right Plaintiff may have to recover fee-shifting from Defendant," and instructed Plaintiff's counsel to submit affidavits in support of their fees on the Contempt Motion.[184] Plaintiff's Application, supported by the necessary Court of Chancery Rule 88 affidavits, requests $218,989.15 in fees and expenses incurred by counsel for Plaintiff in bringing the Contempt Motion.[185] Defendant did not challenge the reasonableness of these fees and expenses.[186] The Rule 88 affidavits did not attach invoices or any other exhibits.

---

[184] Contempt Ord. ¶ 16.

[185] D.I. 95 at Affidavit of Ethan H. Townsend, Esquire, Pursuant to Rule 88 and the Court's Order Granting in Part Plaintiff's Motion for Civil Contempt and Sanctions [hereinafter "Townsend Aff.], and Affidavit of Megan Thibert-Ind, Esquire, Pursuant to Rule 88 and the Court's Order Granting in Part Plaintiff's Motion for Civil Contempt and Sanctions [hereinafter "Thibert-Ind Aff."].

[186] To be clear: the time for Defendant to do so was in connection with Plaintiff's Application.

42

"Delaware law dictates that, in fee shifting cases, a judge determine whether the fees requested are reasonable."[187] The Court "has broad discretion in determining the amount of fees and expenses to award."[188] In assessing the reasonableness of Plaintiff's requested fees, "[t]he Court of Chancery has discretion in determining the level of submission required."[189] Counsel indicated that they "would be happy to provide additional detail regarding [counsel's] fees and expenses should the Court request it."[190] While the Court does not examine each time entry or litigation tactic, invoices will give the Court some indication as to the rates charged or how counsel chose to staff this matter.[191] I therefore request that Plaintiff's counsel include billing statements that pertain to the Contempt Motion when they submit affidavits in support of the fees and expenses incurred for the entire litigation. Given my finding that fees should be shifted for the whole action, Plaintiff's counsel need not break out the fees for the Contempt Motion.

---

[187] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007) (citing Del. Lawyers' R. Prof'l Conduct 1.5(a)(1)(a)); *see also Aveta v. Bengoa*, 2010 WL 3221823, at *4 (Del. Ch. Aug. 13, 2010) (noting that the Court assess fee awards for reasonableness).

[188] *Black v. Staffieri*, 2014 WL 814122, at *4 (Del. Feb. 27, 2014) (TABLE) (citing *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005)).

[189] *Danenberg v. Fitracks, Inc.*, 58 A.3d 991, 995 (Del. Ch. 2012) (citing *Cohen v. Cohen*, 269 A.2d 205, 207 (Del. 1970)).

[190] Townsend Aff. ¶ 9; Thibert-Ind Aff. ¶ 8.

[191] *E.g.*, *Lynch v. Gonzalez*, 2020 WL 5587716, at *3 (Del. Ch. Sept. 18, 2020) (examining the rates, staffing, and discounts to determine the reasonableness of the fees requested), *aff'd*, 253 A.3d 556 (Del. 2021).

43

**III.    CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Civil Contempt and Sanctions is **GRANTED**, and Plaintiff's fees are shifted to Defendant.  Plaintiff's counsel should submit affidavits and exhibits in support of their fees for this action, including the Contempt Motion within ten days of this opinion.